**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **HOME CARE ASSOCIATION OF AMERICA, CALIFORNIA ASSOCIATION FOR HEALTH SERVICE AT HOME,** | **CASE NO. 1:19-CV-0929 AWI EPG** |
| | **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| **Plaintiffs** | |
| **v.** | |
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPCITY AS GOVERNOR OF CALIFORNIA, XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL FOR CALIFORNIA, AND KIMBERLY JOHNSON, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA DEPARTMENT OF SOCIAL SERVICES,** | **(Docs. 26 and 27)** |
| **Defendants** | |

## I. Background

In 2018, the State of California passed AB 2455 which added Cal. Health & Safety Code §1792.29(d) ("AB 2455"):

> (1) For any new registration or renewal of registration occurring on and after July 1, 2019, the department shall provide an electronic copy of a registered home care aide's name, telephone number, and cellular telephone number on file with the department, upon its request, to a labor organization in which a provider of in-home supportive services, as described in Article 7 (commencing with Section 12300) of Chapter 3 of Part 3 of Division 9 of the Welfare and Institutions Code, or a registered home care aide, already participates and which exists for the purpose, in whole or in part, of dealing with employers of home care aides concerning access to training, grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. The labor organization shall not use this information for any purpose other than employee organizing, representation, and assistance activities.

The labor organization shall not disclose this information to any other party.

(2) The department shall establish a simple opt-out procedure by which a registered home care aide or registered home care aide applicant may request that his or her contact information on file with the department not be disclosed in response to a request described in paragraph (1).

The new law requires the Department of Social Services to disclose certain contact information of individuals who are certified home care providers to labor unions to assist in unionization efforts in that industry.  Plaintiffs Home Care Association of America and California Association for Health Service at Home are trade associations whose members are companies that employ home care providers.  Plaintiffs argue that AB 2455 is preempted by the National Labor Relations Act ("NLRA") as administered by the National Labor Relations Board ("NLRB").  Defendants Gavin Newsom, Xavier Becerra, and Kimberly Johnson are California state officials charged with implementing and administering AB 2455.  The complaint seeks declaratory and injunctive relief under two theories of preemption. Doc. 1.  Service Employees International Union Local 2015 is a labor union that represents home care and nursing home workers in California.  SEIU Local 2015 sought leave to intervene as a defendant which was granted. Docs. 8 and 28.  The parties have filed cross motions for summary judgment. Docs. 26 and 27.  The dispute is fundamentally one of law rather than fact and the motions would necessarily resolve this case.

## II. Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

2

Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

**III. Discussion**

**A. Standing**

Defendants argue that Plaintiffs, as associations that represent employers of home care providers lack standing to challenge the law because AB 2455's requirements are not directed at the employers but rather at home care providers, labor unions, and the Department of Social Services. See Doc. 26-1, 13:5-5.  Plaintiffs assert associational standing: "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

The first Hunt requirement examines whether the employers themselves would have standing if they had brought this suit instead of Plaintiffs.  With respect to the rights of the employers, Dean Chalios, President and CEO of CAHSAH, states "The unlawful disclosure requirement of AB 2455 threatens injury to CAHSAH members' efforts to recruit new employees and/or retain employees, and puts CAHSAH members at an unfair disadvantage in dealing with union organizing, contrary to federal law." Doc. 27-5, Chalios Declaration, ¶ 5.  The second assertion appears to be that the employers will be injured because the law will make union organizing easier.

The situation with respect to standing is similar to that of Airline Serv. Providers Ass'n v. Los Angeles World Airports, 873 F.3d 1074 (9th Cir. 2017).  In that case, the city run airport required companies that provided on the ground services "to enter a 'labor peace agreement' with any employee organization that requests one. If such an agreement is not finalized within sixty

days, then the dispute must be submitted to mediation and, if mediation is unsuccessful, to binding arbitration." Id. at 1077.  The Ninth Circuit found that trade associations representing these companies had standing to challenge the requirement because the companies would be "forced into unwanted negotiations that must terminate in either an agreement or arbitral award—something virtually certain to occur given that an organization of service employees advocated for section 25, suggesting that employees plan to make use of the provision….Here, ASPA members will at least have to devote resources, and thus incur economic costs, to participate in negotiations, mediation, and possibly even binding arbitration over a labor peace agreement, which they would not otherwise be required to discuss. The time spent in those negotiations is itself a concrete injury." Id. at 1078.  Airline Serv. Providers Ass'n can broadly be interpreted to stand for the proposition that an employer has standing to challenge government action which results in unionization of that employer's workforce.

Here, Plaintiffs' circumstance is not quite as straightforward.  Whereas the prior precedent involved a situation where the governmental entity directly imposed conditions that promoted unionization on an employer, AB 2455 does so indirectly by providing the contact information of home care workers to labor unions to promote unionization efforts.

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561–62 (1992), citations omitted.  In determining what form of causation and redressability is sufficient, the U.S. Supreme Court requires an injury that is

1    "'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a

2    favorable decision." <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997).  "[W]hat matters is not the

3    'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain.'"

4    <u>Nat'l Audubon Soc'y, Inc. v. Davis</u>, 307 F.3d 835, 849 (9th Cir.2002), quoting <u>Autolog Corp. v.</u>

5    <u>Regan</u>, 731 F.2d 25, 31 (D.C. Cir.1984).

6           In this case, the avowed purpose of the law is clear: "It is the intent of the Legislature that

7    information shared between the State Department of Social Services and labor organizations is

8    done for the purpose of organizing and representing home care aides…" Doc. 26-3, Final,

9    Chaptered Version of Assembly Bill No. 2455 (2018), page 94.  Significantly increasing the

10   likelihood of unionization would satisfy the standing requirements. See <u>Ams. For Safe Access v.</u>

11   <u>DEA</u>, 706 F.3d 438, 448 (D.C. Cir. 2013) (redressability satisfied where the challenged action

12   would "generate a significant increase in the likelihood" of being able to obtain relief).  Thus,

13   though AB 2455 does not require Plaintiffs' members to do anything directly, it does potentially

14   cause future union negotiations that qualify as an injury for purposes of standing.

15          The second <u>Hunt</u> requirement that the protected interest must be germane to the

16   organization's purpose is also met.  Plaintiffs are industry associations whose purpose is to

17   "Protect the interests of the home care industry…" Doc. 27-5, Chalios Declaration, ¶ 6.

18   Defendants implicitly acknowledge that the third <u>Hunt</u> requirement (no need for individual

19   members to participate in suit) is also met. Doc. 26-1, 13:14.

20          Because all three <u>Hunt</u> elements are met, Plaintiffs have standing to pursue this suit.

21

22   **B. Preemption**

23          The National Labor Relations Act ("NLRA") "contains no statutory pre-emption

24   provision" and "[w]here the pre-emptive effect of federal enactments is not explicit, 'courts

25   sustain a local regulation "unless it conflicts with federal law or would frustrate the federal

26   scheme, or unless the courts discern from the totality of the circumstances that Congress sought to

27   occupy the field to the exclusion of the States."'" <u>Metro. Life Ins. Co. v. Massachusetts</u>, 471 U.S.

28   724, 747 (1985), citations omitted.  "The Court has articulated two distinct NLRA pre-emption

principles. The so-called <u>Garmon</u> rule… protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA….A second pre-emption doctrine [<u>Machinists</u>] protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated. The doctrine was designed, at least initially, to govern pre-emption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act." <u>Id.</u> at 748-49, citations omitted. Additionally, these preemption doctrines have been applied to Section 9 of the NLRA. See, e.g. <u>Aeroground, Inc. v. City & Cty. of S.F.</u>, 170 F. Supp. 2d 950, 954-55 (N.D. Cal. 2001).  Broadly speaking, Section 7 of the NLRA states the affirmative right to self-organization and collective bargaining, Section 8 defines a number of unfair labor practices, and Section 9 governs the role and election of labor representatives. 29 U.S.C. §§ 157, 158, and 159.

The preemption analysis is imprecise as "The doctrine is to a great extent the result of this Court's ongoing effort to decipher the presumed intent of Congress in the face of that body's steadfast silence. Mr. Justice Frankfurter aptly described the difficulty of this never-completed task: 'The statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation.' And it is 'because Congress has refrained from providing specific directions with respect to the scope of pre-empted state regulation, [that] the Court has been unwilling to "declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions…."'" <u>Sears v. San Diego Cty. Dist. Council of Carpenters</u>, 436 U.S. 180, 188 n.12 (1978), quoting <u>Machinists v. Gonzales</u>, 356 U.S. 617, 619 (1958) and <u>Farmer v. Carpenters</u>, 430 U.S. 290, 295-96 (1977).

**1. <u>Garmon</u> Preemption**

The central tenet of <u>Garmon</u> preemption is deference to the National Labor Relations Board when a state law is entangled with the NLRA: "At times it has not been clear whether the

particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244-45 (1959).  "The purpose of Garmon preemption is 'to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA.'" Associated Builders & Contractors of S. Cal. v. Nunn, 356 F.3d 979, 987 (9th Cir. 2004), quoting Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 613 (1986). "[T]he Garmon rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." Wis. Dep't of Indus., Labor & Human Rels. v. Gould, Inc., 475 U.S. 282, 286 (1986).  The U.S. Supreme Court has attempted to summarize the bounds of this preemption doctrine as:

> the pre-emption inquiry is whether the conduct at issue was arguably protected or prohibited by the NLRA….
>
> The precondition for pre-emption, that the conduct be 'arguably' protected or prohibited, is not without substance. It is not satisfied by a conclusory assertion of pre-emption….If the word 'arguably' is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board.

Int'l Longshoremen's Asso. v. Davis, 476 U.S. 380, 394-95 (1986), quoting Marine Engineers v. Interlake S. S. Co., 370 U.S. 173, 184 (1962).

Plaintiffs assert that AB 2455 is in conflict with NLRB Rule 102 (specifically 29 C.F.R. §§ 102.62(d) and 102.67(l)).[12] Doc. 1, 6:1-11.  The overall regulatory scheme is summarized by the

---

[1] Technically, Plaintiffs' complaint (Doc. 1, 7:1) and opening brief (Doc. 27-1, 9:2) refer to Section 102.67(k) rather than Section 102.67(l).  Defendants point out that the substance of Plaintiffs' discussion applies to subdivision (l) instead. Doc. 26-1, 7:20-21 fn. 4.  In reply, Plaintiffs acknowledge that reference to subdivision (k) was a typographical error. Doc. 35, 6:27-28 fn. 5.

NLRB as follows:

> When employees and their employer are unable to agree whether the employees should be represented for purposes of collective bargaining, Section 9 of the Act, 29 U.S.C. 159, gives the Board authority to resolve the question of representation…. First, a petition is filed by an employee, a labor organization, or an employer. Second, if there is reasonable cause, an appropriate hearing is held to determine whether a question of representation exists, unless the parties agree that an election should be conducted and agree concerning election details. Hearing officers are authorized to conduct pre-election hearings, but may not make recommendations as to the result. Third, if there is a question of representation, an election by secret ballot is conducted in an appropriate unit. Fourth, the results of the election are certified. The statute also permits the Board to delegate its authority to NLRB regional directors. The statute provides that, upon request, the Board may review any action of the regional director; however, such requests do not stay regional proceedings unless specifically ordered by the Board.

Representation – Case Procedures, 79 Fed. Reg. 74308 (Dec. 15, 2014) (to be codified at 29 C.F.R. Parts 101, 102, and 103). The two provisions in question require employers to provide contact information of employees in preparation for labor elections. 29 C.F.R. § 102.62(d) states in relevant part "Absent agreement of the parties to the contrary specified in the election agreement or extraordinary circumstances specified in the direction of election, within 5 business days after the approval of an election agreement pursuant to paragraph (a) or (b) of this section, or issuance of a direction of election pursuant to paragraph (c) of this section, the employer shall provide to the Regional Director and the parties named in the agreement or direction a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular 'cell' telephone numbers) of all eligible voters." 29 C.F.R. § 102.67(l) similarly states "Absent extraordinary circumstances specified in the direction of election, the employer shall, within 5 business days after issuance of the direction, provide to the Regional Director and the parties named in such direction a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular 'cell' telephone numbers) of all eligible voters."

Plaintiffs argue that personal contact information "can only be disclosed to a labor union

---

[2] Since the filing of these motions, the regulations in question have been amended. 84 Fed. Reg 69524 (Dec. 18, 2019); 85 Fed. Reg. 17500 (March 30, 2020). The former and amended versions are functionally identical for the purposes of this preemption analysis.

1   upon a filing of a representation petition with the NLRB supported by a sufficient showing of

2   interest as to raise a question of representation followed by a stipulated election agreement

3   between the union and the employer, or else following a hearing and direction of election by the

4   Regional Director." Doc. 27-1, 10:23-11:3.  Defendants point to the language in 29 C.F.R. §

5   102.62(d) that limits its applicability ("Absent agreement of the parties to the contrary specified in

6   the election agreement…") to argue that this framework only applies when the employees and

7   employers are unable to come to agreement about labor representation.  "[T]he regulations

8   themselves allow employers and unions to come to their own agreement as to the sharing of

9   contact information." Doc. 26-1, 9:16-17.  Based on this language, Defendants argue that "nothing

10  in the regulations prohibits sharing employee contact information with unions at other times."

11  Doc. 26-1, 9:15-16.  This interpretation is supported by the language of the NLRB which provides

12  a preface to its authority to act: "When employees and their employer are unable to agree whether

13  the employees should be represented for purposes of collective bargaining, Section 9 of the Act,

14  29 U.S.C. 159, gives the Board authority…" 79 Fed. Reg. 74308.

15          Additionally, Defendants argue that the regulatory scheme only covers communication

16  between employers and unions and does not prohibit third parties from providing the contact

17  information of employees. Doc. 26-1, 9:4-5.  "AB 2455 does not, as a legal or practical matter,

18  require home care companies to do anything, prevent home care companies form doing anything,

19  or threaten home care companies with punishment for doing or not doing anything.  The law

20  governs only the State's disclosure of previously-collected information in the State's possession,

21  which the State does not receive from home care companies, which does not belong to home care

22  companies, and which the State discloses without any participation by home care companies."

23  Doc. 31, 8:28-9:6.

24          Based on the law provided, the regulations appear to only mandate that contact information

25  must be provided by the employer in preparation for labor elections and do not state or imply

26  broader rules that limit when labor unions may obtain employee contact information from other

27  sources.  Plaintiffs admit that employers have "the option to disclose (or not disclose) employee

28  contact information to a union" at any time, regardless of whether there is an election. Doc. 35,

7:6-8.  Thus, there is no broader regulatory structure that prevents contact information from being supplied outside the context of an election.  In fact, employer rules that limit the ability of employees to gather and provide contact information to labor unions has been found to violate the NLRA: "The Board properly determined that Quicken's Confidentiality Rule, as applied to personnel information, directly impinged upon employees' Section 7 rights. The very information that portion of the Rule explicitly forbids employees to share—personnel lists, employee rosters, and employee contact information—has long been recognized as information that employees must be permitted to gather and share among themselves and with union organizers in exercising their Section 7 rights." Quicken Loans, Inc. v. NLRB, 830 F.3d 542, 548 (D.C. Cir 2016), citing International Union of Electrical, Radio and Machine Workers v. NLRB, 502 F.2d 349, 351 (D.C. Cir. 1974); Albertsons, Inc., 351 NLRB 254, 259 (2014); HTH Corp., 356 NLRB 1397, 1421 n.19 (2011); and Ridgley Manufacturing Co., 207 NLRB 193, 196-97 (1973); see also Small v. Swift Transp. Co., 2009 U.S. Dist. LEXIS 92084, *2-3 (C.D. Cal. Sep. 18, 2009) (employees "openly discussed the Union at work, encouraged other drivers to support the Union, and collected employee names and contact information for the Union").  Thus, the NLRA does not tightly limit the transmission of contact information to the election context.

In their briefing, Plaintiffs consistently treat the contact information as something that belongs exclusively to employers to do with as they wish. See Doc. 35, 7:7-10 ("the employer has the *option* to disclose (or not disclose) employee contact information to a union. AB 2455, however, strips employers of any choice in the matter of disclosure of their licensed home care employees personal contact information prior to a union's petition and showing of interest").  As shown by the case law, that is not true.  Employers do not have exclusive control over the contact information.  Employees have the right to provide both their own contact information and the information of their fellow employees to unions without employer interference.  The NLRA does not give employers control over contact information in general.

In order to fall within the bounds of Garmon preemption, the objected action must be "arguably protected or prohibited by the NLRA" or interfere with "the integrated scheme of regulation established by the NLRA." Davis, 476 U.S. at 394; Nunn, 356 F.3d at 987.  In this case,

1    it is significant that the contact information is provided by the State of California and does not

2    involve the employers at all.  For such action to be preempted, the NLRA or its integrated scheme

3    of regulation would have to govern when and how labor unions can collect contact information of

4    potential members in all contexts, period.  Plaintiffs have not provided convincing argument that

5    that is true.  In contrast, there is limited case law that suggests union collection of contact

6    information might not be within the bounds of the NLRA.  In one case from the Eastern District of

7    Pennsylvania, a labor union "allegedly recorded license plate numbers from vehicles parked

8    outside of Cintas's Allentown facility, used the license plate numbers to retrieve the addresses of

9    the vehicles' owners from Pennsylvania motor vehicle records, and then contacted the owners at

10   their homes." Pichler v. UNITE (Union of Needletrades, Indus. & Textile Emples.), 339 F. Supp.

11   2d 665, 666 (E.D. Pa. 2004).  Employees who objected to this activity sued under the Driver's

12   Privacy Protection Act of 1994 and the court found that their claim was not within the NLRB's

13   "exclusive jurisdiction over complaints of unfair labor practices" because "plaintiffs are not

14   complaining of unfair labor practices." Id. at 669.  The court expressly disclaimed any analysis of

15   Garmon as the two laws in question were both federal statutes. Id.  "The party claiming

16   preemption bears the burden of demonstrating that the challenged activity is arguably prohibited

17   by the NLRA." Milne Emps. Ass'n v. Sun Carriers, Inc., 960 F.2d 1401, 1414 (9th Cir. 1992),

18   citing Davis, 476 U.S. at 395.

19        Garmon preemption does not apply.  Summary adjudication is granted in favor of

20   Defendants.

21

22   **2. <u>Machinists</u> Preemption**

23        Under Machinists, "a particular activity might be 'protected' by federal law not only when

24   it fell within § 7, but also when it was an activity that Congress intended to be 'unrestricted by any

25   governmental power to regulate' because it was among the permissible 'economic weapons in

26   reserve,… actual exercise [of which] on occasion by the parties, is part and parcel of the system

27   that the Wagner and Taft-Hartley Acts have recognized.' '[T]he legislative purpose may… dictate

28   that certain activity "neither protected nor prohibited" be deemed privileged against state

1  regulation.'" Int'l Ass'n of Machinists & Aero. Workers v. Wis. Emp't Relations Comm'n, 427

2  U.S. 132, 141 (1976), quoting NLRB v. Insurance Agents, 361 U.S. 477, 488-89 (1960) and

3  Hanna Mining Co. v. Marine Engineers, 382 U.S. 181, 187 (1965).  "[T]he use of economic

4  pressure by the parties to a labor dispute is not a grudging exception to some policy of completely

5  academic discussion enjoined by the Act; it is part and parcel of the process of collective

6  bargaining." NLRB v. Ins. Agents' Int'l Union, 361 U.S. 477, 495 (1960).  "Whether self-help

7  economic activities are employed by employer or union, the crucial inquiry regarding pre-emption

8  is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help

9  would frustrate effective implementation of the Act's processes.'" Int'l Ass'n of Machinists, 427

10  U.S. at 147-48, quoting Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380

11  (1969).

12        Plaintiffs argue that "the NLRA leaves unregulated, except as determined by the NLRB,

13  any authority for governments to assist labor unions by providing them with special access to the

14  personal contact information of employees….Therefore, by deliberately disclosing to labor unions

15  personal contact information of employees of Plaintiffs' member employers, AB 2455 regulates

16  within a zone protected and reserved for market freedom by Congress and is again preempted

17  under the Supremacy Clause." Doc. 27-1, 13:13-19.  Defendants assert that Machinists preemption

18  does not apply because "AB 2455 is unrelated to the collective bargaining process, does not

19  attempt to regulate 'weapons' that labor and management might use in negotiations, and does not

20  regulate the mechanics of labor disputes." Doc. 26-1, 12:26-28.  The plain purpose of the law is to

21  promote unionization and thus it may have an indirect effect on labor disputes.  The pertinent legal

22  question is whether AB 2455's indirect effect falls within the zone reserved for unencumbered

23  negotiation between employers and unions.

24        Plaintiffs cite extensively to Chamber of Commerce of the United States v. Brown, 554

25  U.S. 60 (2008).  California passed a law prohibiting "certain employers that receive state funds--

26  whether by reimbursement, grant, contract, use of state property, or pursuant to a state program--

27  from using such funds to 'assist, promote, or deter union organizing.'" Id. at 63.  The U.S.

28  Supreme Court found that this restricted employer speech in a way that intruded on the protected

1    zone.  Parts of the NLRA "manifested a 'congressional intent to encourage free debate on issues

2    dividing labor and management.' It is indicative of how important Congress deemed such 'free

3    debate' that Congress amended the NLRA rather than leaving to the courts the task of correcting

4    the NLRB's decisions on a case-by-case basis. We have characterized this policy judgment, which

5    suffuses the NLRA as a whole, as 'favoring uninhibited, robust, and wide-open debate in labor

6    disputes,' stressing that 'freewheeling use of the written and spoken word…has been expressly

7    fostered by Congress and approved by the NLRB.'" Id. at 67-68, quoting Linn v. Plant Guard

8    Workers, 383 U.S. 53, 62 (1966) and Letter Carriers v. Austin, 418 U.S. 264, 272-73 (1974).  The

9    court found an express preclusion of "regulation of speech about unionization 'so long as the

10   communications do not contain a "threat of reprisal or force or promise of benefit."'" Brown, 554

11   U.S. at 68, quoting NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969).  This precedent does

12   not directly resolve the question of whether Machinists preemption applies to AB 2455.  The law

13   in question does not restrict the speech of either side.

14            More useful to the question at hand is Kapiolani Med. Ctr. for Women & Children v.

15   Hawaii, 82 F. Supp. 2d 1151 (D. Haw. 2000).  Hawaii passed two statutes, only one of which was

16   preempted.  The preempted statute "impose[d] liability on the employment agency or individual

17   which aids the employer in finding replacement workers and on the replacement worker who takes

18   the place of the striking employee." Id. at 1153.  However, "an employer may replace striking

19   employees in an effort to carry on his business. The employer's right to hire replacement

20   employees is considered an economic weapon of self-help which is permitted by federal law." Id.

21   at 1156-57, citations omitted.  This provision intruded on the protected zone by taking away one

22   of the weapons employers have at their disposal during a labor dispute.  The other statute did not

23   impose any direct restriction on hiring replacement employees but instead required that any

24   advertisement soliciting workers to replace striking employees explicitly state that a labor dispute

25   existed. Id. at 1158.  While this did have an indirect impact on labor negotiations, the court

26   concluded that "requiring truthful advertising does not affect the employers ability to find

27   replacements. Plaintiff did not provide any evidence that this section interferes with their right to

28   hire replacement workers. Plaintiff also stated that a prudent employer may very well include the

fact that there was a labor dispute in the advertisement in order to avoid any accusations of fraud or misrepresentation. Thus, there is only a minor or indirect impact on the bargaining process because the employer is still entitled to advertise for replacement workers, the statute merely requires that such advertisement be truthful." Id. at 1159.

Taken together, Brown and Kapiolani suggest that laws which promote open debate and the dissemination of information do not intrude on the zone of free negotiation protected by Machinists. AB 2455 promotes open communication in that it makes it easier for labor unions to contact prospective members for purposes of unionization. As with the non-preempted statute in Kapiolani, AB 2455 would have only a minor or indirect impact on the actual bargaining process. There is no showing that the scale of AB 2455's effect on negotiations would be dramatic. "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" Int'l Ass'n of Machinists, 427 U.S. at 147-48, quoting Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380 (1969). AB 2455 does not reach the level of curtailing or prohibiting any strategy an employer might wish to deploy in union negotiations.

Machinists preemption does not apply. Summary adjudication is granted in favor of Defendants.

## IV. Order

Defendants' motion for summary judgment is GRANTED.

Plaintiffs' motion for summary judgment is DENIED.

The Clerk shall enter judgment for Defendants and close this case.

IT IS SO ORDERED.

Dated:   March 10, 2021                    _____

                                           SENIOR  DISTRICT  JUDGE